**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT P. DUNN, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-3643 |
| | § | |
| ADMIRALTY MARINE AND | § | |
| STRUCTURAL ENGINEERING, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This case arises out of a 2008 verbal contract to design a drilling-rig mast[1] that was to be fabricated by a third party and installed on a drilling barge. Robert Dunn, Drill Fab Services, Ltd., and Megadrill Services, Ltd. (together, the "plaintiffs"), sued Edward Turner and Admiralty Marine and Structural Engineering, Inc. ("AMASE"; together, the "defendants"), alleging that after the defendants designed the mast and a separate company, Discovery Drilling Equipment ("DDE"), fabricated and installed it on the rig, the mast structure failed and could not be raised. The plaintiffs allege that Turner and AMASE's improper design caused the mast to fail. The plaintiffs assert causes of action for breach of the design contract; for negligence in designing the mast, in failing to perform appropriate analyses and in inspecting the mast's fabrication; and for breach of express and implied warranties. (Docket Entry No. 1 at 5–7).

The plaintiffs filed this in federal court on December 14, 2012 on the basis of diversity jurisdiction. (*Id.* at 1). After discovery, the defendants moved for summary judgment, (Docket

---

[1] A mast is "[t]he structure used to support the crown block and the drill string" on a drilling rig. "Masts are usually rectangular or trapezoidal in shape and offer a very good stiffness." Mark Ramsey, *Mast*, SCHLUMBERGER OILFIELD GLOSSARY, available at http://www.glossary.oilfield.slb.com.

Entry No. 37), the plaintiffs responded, (Docket Entry No. 40), the defendants replied, (Docket

Entry No. 41), and the plaintiffs surreplied, (Docket Entry No. 42).

Based on the pleadings, the motion, the parties' briefs and submissions, the record, and the

applicable law, this court:

- denies summary judgment as to the negligence claims against both defendants;

- grants summary judgment as to the breach of express warranty claims against both defendants;

- grants summary judgment as to the breach of implied warranty claims against both defendants;

- grants summary judgment as to the breach of contract claim against Turner; and

- denies summary judgment as to the breach of contract claim against AMASE.

The reasons for these rulings are explained in detail below.  A status and scheduling

conference is set for **August 5, 2014**, **at 2:00 p.m. in Courtroom 11-B**.

## I.      Background

### A.      The Summary Judgment Evidence

The summary judgment evidence included the depositions of Robert Dunn, the owner and

president of Drill Fab Services, Ltd. and Megadrill Services Ltd., (Docket Entry No. 37, Ex 1); Chris

Haist, a DDE project engineer who worked on the mast, (Docket Entry No. 37, Ex. 3); Edward

Turner, the owner and president of AMASE, (Docket Entry No. 40, Ex. 27); and Neal Hare, an

AMASE project engineer who worked on the drilling rig project, (Docket Entry No. 40, Ex. 28); the

declaration of George R. Ross, the expert testifying for the plaintiffs, (Docket Entry No. 40, Ex. 29);

and AMASE's mast design drawings, (Docket Entry No. 40, Exs. 4, 14, 16).

Drill Fab and Megadrill are in the business of constructing and chartering drilling barge rigs for the offshore oil and gas industry.  (Docket Entry No. 1 at 3).  The complaint alleged that Dunn, acting on behalf of Drill Fab and Megadrill, sought out Turner and AMASE to design the mast for the *Majestic*, a posted swamp drilling barge rig.[2]  (*Id.*).

In April 2009, Drill Fab and Megadrill verbally contracted with Turner and AMASE to design a "[two] million pound safe hook load capacity drilling mast" for the *Majestic* drilling rig.  (Dunn Dep. at 35).  A drilling rig's mast "is an integral part of the whole drilling process[,]" as "[w]ithout a mast . . . one is not able to drill."  (*Id.* at 29).  The agreement called for "professional engineering analysis from [AMASE], as well as design drawings for fabrication of the mast," (*Id.* at 38), and the plaintiffs alleged that AMASE also agreed to provide "progress reports and site management" of the fabrication process, (Docket Entry No. 40 at 4).

Neal Hare, an AMASE engineer, served as the project engineer for the design work.  (Hare Dep. at 7, 9).  At Dunn's request, Hare based the design for the *Majestic* mast on the mast of an unrelated rig, designed by an unrelated company.  (*Id.* at 9, 12).  Hare changed the design to comply with the third edition of the American Petroleum Institute ("API") 4F Specification,[3] published in 2008, after the previous mast was designed.  (*Id.* at 12, 13).  Hare adjusted the old design because "some of the loads and some of the loading conditions" changed under the API specification's

---

[2]  Posted barge rigs are "mobile drilling platforms that are submersible and are built to work in seven to 20 feet of water. They are towed by tugboats to the drill site with the derrick laying down. The lower hull is then submerged by flooding compartments until it rests on the river or sea floor. The derrick is then raised and drilling operations are conducted with the barge resting on the bottom." *Drilling Rig & Derrick Fabrication*, SUPERIOR DERRICK SERVICES, available at http://www.superiorderrick.com/Rig-and-Derrick-Fabrication.php.

[3]  API Specification 4F "states the requirements and gives recommendations for suitable steel structures for drilling and well servicing operations in the petroleum industry. . . . This specification is applicable to all new steel . . . masts . . . with a date of manufacture after the effective date of this specification." *API Specification 4F*, American Petroleum Institute, available at http://www.api.org/publications-standards-and-statistics/standards/whatsnew/publication-updates/new-exploration-and-production-publications/api_spec_4f.

updated requirements.  (*Id.*).  Hare did computer modeling and engineering analysis on the mast

design and sent it to Turner for review.  (*Id.* at 12–14).  An AMASE draftsman made the drawings

for the mast that Hare had designed.  (*Id.* at 13–15; Docket Entry No. 40, Ex. 6).

Dunn selected a Ukrainian company, DDE, to build the mast at a DDE facility in Styri,

Ukraine.  (Dunn Dep. at 29).  At Dunn's request, Hare traveled there "to find out if the fabrication

yard in Styri was capable of building the mast . . . designed."  (Hare Dep. at 17).

As of August 20, 2010, Hare knew that the mast would include a top drive[4] and top-drive

tracks.[5]  (*Id.* at 33–36).  Hare's testified that the top-drive tracks were not included in his design or

analysis responsibilities.  Instead, Dave Godin, an engineer with a separate company, Global

Drilling Support, took responsibility for designing and installing the top drive and top-drive tracks.

(*Id.* at 33–35).  Although Hare knew that the mast would have a top drive and top-drive tracks, he

did not ask for information about them or include the weight they would add to the mast in his

analysis.  (*Id.* at 35–36).

As of August 23, 2010, AMASE had not provided any design drawings to DDE.  (*Id.* at 35).

On September 8, 2010, Turner emailed design drawings to DDE.  (Docket Entry No. 37, Ex. 4).  The

drawings were labeled "issued for construction."  (Docket Entry No. 40, Exs. 4, 14, 16).  The

plaintiffs allege that the mast shown in the design drawings sent to DDE on September 8, 2010

contained a top drive.  (Docket Entry No. 42 at 4 (citing Docket Entry No. 40, Ex. 4. S108 Revision

0, Sheet 1 of 5)).  DDE's project engineer, Chris Haist, converted the American steel shapes shown

---

[4]  A top drive is an electric or hydraulic motor suspended in the mast of the rig with the ability to travel up and down
the mast that rotates the drill string and drill bit.  Mark Ramsey, *Top drive*, Schlumberger Oilfield Glossary,
available at http://www.glossary.oilfield.slb.com.

[5]  Summary judgment evidence uses both top drive track and top drive tracks interchangeably.  For consistency, this court
uses "top-drive tracks."

in the design drawings into European steel shapes and added top-drive tracks to the mast.  (Haist
Dep. at 42).  Because DDE would be obtaining the steel for fabricating the mast from European
mills, European steel shapes were required.  (*Id.*)  The conversion involved more than converting
inches into centimeters.  (*Id.*).  European steel shapes or "European sections," are similar to the
Imperial shapes, also referred to as "American sections," but differ in the dimensions, thickness,
length, and weight.  (*Id.* at 42–43).  Haist acknowledged that the changes from Imperial to European
steel shapes were changes to the design.  (*Id.* at 43).

DDE also made other design changes, including:

- adding a trap door on the crown over the ladder;

- adding a self-closing gate on the racking board ladder;

- adding a pedestal for another air winch on the racking board;

- adding three five-kip padeyes;

- adding an aircraft warning beacon;

- adding a 200-mm wire tray;

- using bearings instead of bushings;

- adding multiple platforms on the mast;

- adding span breakers and structural steel angles;

- adding a ladder on each side of the A-frame of the mast; and

- adding covers to the platforms.

(*Id.* at 68–83).  The record does not make clear what impact any, or all, of the changes had on the
structural strength of the mast.

DDE placed its "API plate" on the final design drawings used to fabricate the mast.  (Docket

Entry No. 37, Ex. 6).  The AMASE drawings sent to DDE on September 8, 2010 called for A-frame connection pins with a three-inch diameter.  (Docket Entry No. 40, Ex. 4. S108 Revision 0, Sheet 1 of 5).

AMASE received progress reports from DDE during the mast's fabrication.  (*Id.*, Exs. 11–13).  During the fabrication, AMASE provided DDE with additional design drawings.  These drawings, like the September 8 drawings, were labeled "issued for construction." (*Id.*, Ex. 14. G102 Revision 1).  Like the September 8 drawings, these also called for two, three-inch diameter A-frame connection pins, labeled "J." (*Id.*, Ex. 14. G102 Revision 1, Sheet 2 of 2).  The plaintiffs argue that these more recent design drawings also show a top drive.  Haist, the DDE engineer working on the fabrication, did not separately  analyze the A-frame connection pins.  (Haist Dep. at 52–53).

An AMASE invoice sent to the plaintiffs shows that Chris Taylor, an AMASE engineer, made changes to the mast design, specifically to the pin connections, months after AMASE sent the design drawings to DDE.  (Docket Entry No. 40, Ex. 15).  The invoice contains date entries listing the employee's initials; a brief, nonspecific description of the work completed; and the time frame and hours worked.  (*Id.*).  The invoice shows that between December 1 and December 15, 2010, Taylor worked to "recheck sizing of mast section pins," "check sizing of mast diagonal pins," "recalculate A[-]frame forces," "resize A[-]frame pins and pin plates," "redesign A[-]frame pin connections," and "correct A[-]frame pin drawings. (*Id.* at DUNN-00087). The summary judgment evidence does not establish whether this analysis or redesign was specifically related to the increase in diameter for the A-frame connection pins.  The invoice entries describing Taylor's work on December 27 and December 28, 2010 stated "check, correct, and print pin [calculations]." (*Id.* at DUNN-00088).  On January 10, 2011, another AMASE employee with the initials BDB "check[ed

the] pin schedule and pin details," and on January 13, 2011, Taylor made "mast modifications." (*Id.* at DUNN-00089). The record does not clearly identify what modifications Taylor made or when the decision was made to increase the diameter of the A-frame connection pins.

Hare returned to DDE's fabrication yard in Styri on January 21, 2011, while the mast was still in the fabrication process. (Hare Dep. at 55, 61). On January 31, 2011, AMASE updated and revised the drawing "G102 Sheet 1 of 2," adding two pins labeled "P" and two pins labeled "Q" and removing the two pins labeled "J." (Docket Entry No. 40, Ex. 16. G102 Revision 2, Sheet 1 of 2). Pins "J" and "P" are both A-frame connection pins; pins "P" replaced pins "J". (Hare Dep. at 85). The "J" pins were three inches in diameter; the replacement "P" pins were three and seven-sixteenth inches in diameter. (*See* Docket Entry No. 40, Exs. 14, 16). The design drawing shows that the two larger pins (three and seven-sixteenth inches in diameter), labeled "P," take the place of the two three-inch diameter pins, labeled "J." (*Compare id.*, Ex. 16. G102 Revision 2, Sheet 1 of 2, *with id.*, Ex. 14. G102 Revision 1, Sheet 1 of 2). On March 7, 2011, AMASE revised the design drawing "G102 Sheet 2 of 2" to update the Pin List. (*Id.*, Ex. 16. G102 Revision 2, Sheet 2 of 2). Neither party addresses the two other pins added in Revision 2, labeled "Q."

Taylor and Hare exchanged emails discussing these design changes. In a February 28, 2011, email, Taylor (at AMASE) confirmed to Hare (at DDE) that two A-frame connection pins were changed to increase the diameter from three inches to three and one-half inches.[6] In a March 2, 2011 response, Hare asked Taylor to send "them" the change in pin diameter. (Docket Entry No. 40, Ex. 17). In his deposition, Hare explained that he was instructing Taylor to send the change in pin diameter to DDE. (Hare Dep. at 100).

---

[6] The court assumes Taylor's description of the pin size as 3-1/2" to be a rounded number for the calculated 3-7/16".

Turner was aware of the design change in the pin size between pins "J" and pins "P," but he did not know whether the change was communicated to DDE.  (Turner Dep. at 55–56).  Hare did not know if the change was communicated to DDE.  He could testify only that "if [someone] made a change, the fabricator has to get it," (Hare Dep. at 89), and that Turner would have been among those at AMASE responsible for communicating the change, (*id.* at 90).

The DDE witnesses testified consistently that DDE did not learn of the change to the pin diameter, or even of AMASE's reanalysis of the pins.  It is undisputed that DDE fabricated the mast using the two three-inch diameter connection pins originally specified in the AMASE design drawings, not the larger size pins.  (Haist Dep. at 112–113).

Another AMASE engineer, Joe Brown, went to the Styri fabrication yard on April 5, 2011 to do a quality-control inspection.  Brown's inspection included a visual inspection of all mast elements and connections, review of the inspection reports, review of critical path elements, witness the examination of critical path connections and welds, and review of material traceability.[7]  (Docket Entry No. 40, Ex. 21).  Turner reported to Dunn that the mast inspection was "successfully completed" and attached the report Joe Brown wrote.  (*Id.*, Ex. 22).

On December 19, 2011, the A-frame failed when the plaintiffs attempted to raise the mast on the drilling barge.  (*Id.*, Ex. 23).  One leg of the A-frame twisted and buckled, two connection pins bent, and four bolts were sheared.  (*Id.*).  According to Hare's report, which is based on what witnesses at the Batam shipyard told him, (Hare Dep. at 77), the mechanical-weight indicator showed that the A-frame failed when the load was about 600,000 pounds.  (Docket Entry No. 40,

---

[7]  Materials traceability is the ability to identify a specific piece of steel in a structure and its specific Mill Test Report, which is a record of the chemical content and mechanical properties of each "heat" of steel. *Engineering FAQs: Material Identification and Traceability*, AMERICAN INSTITUTE OF STEEL CONSTRUCTION, available at https://www.aisc.org/DynamicMain.aspx?id=2100.

Ex. 23).  Hare had calculated the maximum potential load the frame could withstand to be "between

620,000 to 630,000 pounds."  (Hare Dep. at 77).  It is unclear if this potential load calculation was

made using the original three inch pins or the larger pins specified in AMASE's revised design

drawings.

The two A-frame connection pins that bent during the raising process, identified by Hare in

his report as pins "P" from the AMASE drawing G102 Revision 2, were the two pins that AMASE

changed during the design process.  (Docket Entry No. 40, Ex. 23).  As noted, DDE did not learn

of the change and DDE used the smaller (three-inch) pins rather than the updated, larger (three-and-

seven-sixteenth inch) pins.  (Hare Dep. at 103).  Hare testified in his deposition that if DDE had

received and used the drawing labeled G102 Revision 2, the pins used in the fabrication would have

been the larger size.  (*Id.*).  Hare would not speculate as to whether using the bigger pins would have

prevented the mast from failing.  (*Id.*).

The plaintiffs' expert witness, George R. Ross, stated in his declaration that "[t]he failure

of the A-frame of the mast was the result of incorrect sizing of the A-frame connection pins by

AMASE, as listed in the AMASE design drawings issued to [DDE] for the fabrication of the A-

frame and mast."  (Ross Decl. at 2).  The defense did not present an expert witness but did present

deposition testimony from Turner and Hare to support the lack of a causal connection between the

design work done by AMASE and the failure of the mast.

The summary judgment evidence is examined under the applicable legal standards.

## II.    The Legal Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."

FED. R. CIV. PROC. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record...."  FED. R. CIV. PROC. 56(c)(1)(A).  "[T]he plain language of Rule 56[ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact."  *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex*, 477 U.S. at 323).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact, it does not need to negate the elements of the nonmovant's case.  *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Duffie*, 600 F.3d at 371 (internal quotation marks omitted).

"When the moving party has met its Rule 56[ ] burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings."  *Id.*  The nonmovant must identify specific evidence in the record and articulate how that evidence supports

that party's claim.  *Id.* (internal quotation marks omitted).  "This burden will not be satisfied by

'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'"  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540

(5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"In deciding a summary judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party."  *Duffie*, 600 F.3d at 371.

## III.    Analysis

### A.    The Negligence Claims

The plaintiffs contend that AMASE and Turner were negligent in designing the mast, in

failing to perform appropriate analyses, and in inspecting the mast's fabrication.  AMASE and

Turner contend that the negligence claim fails as a matter of law.  They argue that the undisputed

evidence of DDE's changes to AMASE's mast design drawings means that these changes broke any

causal connection between AMASE's design and the mast failure.  AMASE and Turner emphasize

that DDE created the design drawings "from scratch" and had responsibility for the engineering

work on the mast.  (Docket Entry No. 37 at 6 (citing Haist Dep. at 50)).

The issue raised by this argument is whether independent causes intervened to break any

causal connection between the alleged negligence of AMASE and Turner and the mast failure.

There is no dispute that Texas law applies.  The elements of negligence under Texas law are that:

(1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the duty; and (3) the

defendant's breach proximately caused injury to the plaintiff.  *IHS Cedars Treatment Center v.

Mason*, 143 S.W.3d 794, 798 (Tex. 2003).  "The two elements of proximate cause are cause in fact

and foreseeability."  *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).  Cause in fact is

present if the act or omission was a substantial factor in bringing about the injury.  *Id.*  There may be more than one proximate cause.  *See id.*

"A new and independent cause of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question."  *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 858 (Tex. 2009).  Whether a separate and independent agent's act or omission destroys the causal connection depends on "'whether the intervening cause and its probable consequences were such as could reasonably have been anticipated by the original wrongdoer.'"  *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 452 (Tex. 2006) (quoting *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968)); *see also* RESTATEMENT (SECOND) OF TORTS § 447 (1965).  Under the Restatement, "the fact that an intervening act of a third person is negligent in itself . . . does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about" if the actor, or a reasonable man in his situation, should have realized that a third person might act or if the intervening act is a normal consequence of the actor's conduct.  RESTATEMENT (SECOND) OF TORTS § 447 (1965).  "When the intervening illegal negligent act is foreseeable, it does not negate the continuing proximate causation and consequent liability of the initial actor."  *Travis*, 830 S.W.2d at 98; *see also Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 550 (Tex. 1985).

In arguing that there are factual disputes material to determining whether the design work by AMASE and Turner contributed to the mast failure, the plaintiffs first point to the fact that the AMASE design drawings were labeled "issued for construction."  (Docket Entry No. 40 at 2 (citing Exs. 4, 14, 16)).  The plaintiffs point to the deposition testimony of their expert witness, George R.

Ross, stating that the mast would have failed even if DDE had fabricated the mast AMASE designed, following the AMASE drawings sent to DDE and labeled "issued for construction." (Ross Decl. at 5). The plaintiffs also argue that AMASE and Turner were involved in the mast's design throughout the fabrication process. (Docket Entry No. 40 at 3). The plaintiffs point to the presence of AMASE engineer Hare at the Styri yard during the mast fabrication, (Hare Dep. at 30, 53–60), and at the shipyard during the rig construction, (*Id.* at 19). Hare admitted being at the shipyard, but stated that his presence was not in connection with the mast design but rather in connection with aspects of the rig design unrelated to this dispute. (*Id.*).

There is evidence that AMASE and Turner were involved throughout the design process and participated in the fabrication work and that Hare was present at the fabrication yard. This evidence raises factual disputes whether and to what extent AMASE and Turner were involved throughout the fabrication process. This evidence, including Hare's deposition testimony explaining his presence as unrelated to the mast design, creates factual disputes material to determining the nature and extent of, and the reasons for, the defendants' involvement in DDE's work.

The plaintiffs also point to evidence showing that the defendants continued work on analyzing the connection-pin design after sending DDE drawings labeled "issued for construction" and after DDE began its fabrication work. The plaintiffs point to AMASE billing records showing that between December 8 and December 14, 2010 an AMASE engineer checked the A-frame pin connections and recalculated and redesigned the pin size. (Docket Entry No. 40, Ex. 15). On December 27, December 28, 2010, and January 10, 2011, the engineer again checked the A-frame pin connections. (*Id.*). On January 13, 2011, the engineer made "mast modifications." (*Id.*). On March 7, 2011, AMASE revised the design drawings, replacing the two three-inch diameter A-frame

connection pins with two three and seven-sixteenth inch diameter connection pins, as seen in G102 Revision 2, Sheet 2 of 2. (*Id.*, Ex. 16. G102 Revision 2, Sheet 2 of 2). The record includes evidence that the defendants failed to communicate to DDE the design changes in the pin-diameter size. There is no record evidence that the defendants transmitted the revised design drawing showing the larger pin size to DDE before the mast failure. (Docket Entry No. 40 at 8). The plaintiffs emphasize the evidence that AMASE failed to communicate its continued analysis of, and the change to, the diameter of the pin connections after fabrication work began. (*Id.*).

Summary judgment on the negligence claim is inappropriate based on the present record. The evidence of the defendants' continued pin analysis, of the design change to the connection pins, of the lack of communication to DDE of this design change, and of the role of the pins and the pin size when the structure failed, give rise to factual disputes including: whether and to what extent the defendants' acts or omissions caused the A-frame structure to fail; whether DDE's acts or omissions, particularly in installing the three-inch rather than larger pins, were foreseeable to the defendants; and whether and to what extent DDE's acts or omissions caused the failure. The record shows that there are factual disputes material to determining whether DDE relied on the initial design drawings—labeled "issued for construction"—that AMASE issued and whether reliance on those drawings caused the mast failure.

The defendants' motion for summary judgment dismissing the plaintiffs' negligence claims is denied.

### B.     The Breach of Warranty Claims

AMASE and Turner moved for summary judgment dismissing the breach of warranty claims, arguing that there is no evidence that an express or implied warranty existed. The elements of

breach of express warranty are: "(1) the defendant-seller made an express affirmation of fact or promise relating to the goods; (2) that affirmation or promise became part of the bargain; (3) the plaintiff relied upon that affirmation or promise; (4) the goods did not comply with the affirmation or promise; (5) the plaintiff was damaged by the noncompliance; and (6) the failure of the product to comply was the proximate cause of the plaintiff's injury." *Scott v. Dorel Juvenile Grp., Inc.*, 456 F. App'x. 450, 456 (5th Cir. 2012); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 814 (S.D. Tex. 2013); *see also* TEX. BUS. & COM. CODE § 2.313.  An implied warranty of fitness for a particular purpose arises "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." TEX. BUS. & COM. CODE § 2.315.

The defendants argue that there is no record evidence of an affirmation or promise to the plaintiffs about the mast design, and therefore there is no basis for a finding an express warranty.  The defendants point to Dunn's deposition testimony that Turner made no express warranty to him about DDE's revised mast designs, (Dunn Dep. at 40), and the absence of any evidence that anyone else at AMASE expressly warranted the mast design.

The plaintiffs do not directly address these arguments in their responses.  (Docket Entry Nos. 40, 42).  Instead, they point to the fact that the design drawings AMASE sent to DDE were labeled "issued for construction."  (Docket Entry No. 40, Exs. 4, 14, 16).  The plaintiffs do not explain or identify support in the record or case law for the argument that this label in itself creates an express warranty that was part of the basis of the bargain, as required under § 2.313 of the Texas Business and Commerce Code.  Without identifying specific evidence in the record to support an express warranty, the plaintiffs cannot survive summary judgment on the breach of express warranty claim.

The defendants' motion for summary judgment dismissing the breach of express warranty claims is granted.

The defendants also seek summary judgment dismissing the claim for breach of implied warranty of fitness for a particular purpose.   Section 2.315 on implied warranties applies to transactions in goods but not personal services.  TEX. BUS. & COM. CODE § 2.102; *Tex. Dev. Co. v. Exxon Mobil Corp.*, 119 S.W.3d 875, 881 (Tex. App.—Eastland 2003, no pet.); *Montgomery Ward & Co. v. Dalton*, 665 S.W.2d 507, 511 (Tex. App.—El Paso 1983, no writ.).   A contract that involves the sale of both goods and services falls under Chapter 2 only "if the sale of goods is the dominant factor."  *Tex. Dev. Co.*, 119 S.W.3d at 881.

The defendants argue, persuasively, that Chapter 2 does not apply here because the contract was not for the sale of goods but rather for engineering and design services.  (Docket Entry No. 37 at 11).   Contracts calling for design, engineering, fabrication, and installation work relating to drilling rigs are generally characterized as contracts for services, not goods.  *Texas Development Company*, 119 S.W.3d at 881–82, is instructive.  In that case, the court concluded that Chapter 2 did not apply to an agreement calling for the design of rig modifications, the fabrication and installation of those modifications, and the structural assessment of the drilling unit, because the essence of the agreement was the furnishing of engineering services.  *Id.* at 882.  Similarly, in *G–W–L, Inc. v. Robicaux*, 643 S.W.2d 392, 394 (Tex. 1982) (overruled on an issue of waiver, which is not an issue here), the court concluded that Chapter 2 did not apply to a contract to build a house, to provide the labor and material for the construction, and to sell the house, because the essence of the agreement was for services, not goods.  *Robicaux*, 643 S.W.2d at 394.

These cases and the undisputed record evidence lead to the conclusion that, as a matter of

law, the parties' verbal contract for the defendants to design the mast and to manage the fabrication process was an agreement for services, not for goods. The contract called for less physical work product than the agreement in *Texas Development Company*, which the court found to be a contract for services, not goods. Because the essence of the parties' agreement in this case was the provision of engineering services, Chapter 2 and the implied warranty of fitness for a particular purpose do not apply. The defendants' motion for summary judgment dismissing the breach of implied warranty of fitness claims is granted.

### C.     The Breach of Contract Claims

Turner argues that he did not have any contract with the plaintiffs. Both Turner and AMASE argue that there is no evidence of breach of contract.

Generally, an agent is not personally liable for acts or omissions breaching contracts made on his principal's behalf, if the agent was acting within the scope of his authority. *Arzehgar v. Dixon*, 150 F.R.D. 92, 94 (S.D. Tex. 1993)*; Corpus Christi Dev. Corp. v. Carlton*, 644 S.W.2d 521, 523 (Tex. App.—Corpus Christi 1982, no writ). "As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995); *see also Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996); *Arzehgar*, 150 F.R.D. at 94; *Corpus Christi Dev. Corp.*, 644 S.W.2d at 523; RESTATEMENT (SECOND) OF AGENCY § 320 (stating that "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract"). When an agent acts outside his authority under the agency agreement, he can be held personally liable. *See Martinez v. State Farm Lloyds*, 204 F. App'x. 435, 435–36 (5th Cir. 2006); *Arzehgar*, 150 F.R.D. at 94; *Schwarz v. Straus–Frank Co.*, 382 S.W.2d 176, 178 (Tex. Civ.—San Antonio 1964, writ ref'd

n.r.e.).

Turner points to Dunn's deposition testimony admitting that the verbal contract was between himself on behalf of Megadrill Services and Turner on behalf of AMASE.  (Dunn Dep. at 37).  Turner also points to the fact that AMASE issued and paid all the invoices.  (Docket Entry No. 37, Ex. 2).  Finally, Turner points to the absence of any evidence that he was acting outside his capacity as AMASE's agent.

The plaintiffs do not specifically address Turner's personal liability on the breach of contract claim.  Instead, they generally assert that Turner is personally liable on all the claims.  The plaintiffs point to deposition testimony that Turner was responsible for the design and was involved in reviewing the project, (Turner Dep. at 28, 34), discussing the pin-size changes, (Docket Entry No. 40, Ex. 17), and that he was responsible for communicating design changes to the fabricator, (Hare Dep. at 89–90).

When read in full and in context, however, the testimony shows that Turner's responsibilities all arose out of, and were within, his duties at AMASE.  Turner's involvement with, and responsibility for, the mast design is not inconsistent with the actions of an employee, officer, or agent.  The record shows no evidence that Turner acted beyond the scope of his role as an officer or agent for  AMASE.  Turner's motion for summary judgment dismissing the breach of contract claim against him personally is granted.

Under Texas law, "[t] o recover for breach of contract, a plaintiff must show (1) existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result of the defendant's breach." *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 920 (Tex. App.—Houston [14th

Dist.] 2011, pet. denied); *accord Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009).

Damages must be a "natural, probable, and foreseeable consequence of the defendant's conduct."

*Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). "This 'question of causation

(foreseeability) which controls liability should be determined from the facts and circumstances of

each particular case, and except where reasonable minds cannot differ, the issue is one for the jury.'"

*X Tech., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 412 (5th Cir. 2013) (citing *Strakos v. Gehring*,

360 S.W.2d 787, 792 (Tex. 1962)).

AMASE does not dispute the validity of the oral contract. (Docket Entry No. 37 at 3).

AMASE disputes whether its acts or omissions breached that contract or caused the damages the

plaintiffs allege. There are factual disputes material to deciding whether AMASE's acts or

omissions breached the contract and, if so, whether those acts or omissions caused the A-frame to

fail. AMASE's arguments that the record shows no causation and therefore no breach of contract

are the same no-causation arguments the defendants made in seeking summary judgment on the

negligence claims. The arguments fail for similar reasons. The evidence of the extent to which

AMASE's acts and omissions on the design and fabrication supervision, as opposed to DDE's

design changes and fabrication work, caused the A-frame to fail, is disputed and gives rise to

conflicting inferences. The plaintiffs point to the evidence showing that AMASE continued to

analyze the connection pins while DDE was fabricating the mast, after sending DDE drawings

labeled "issued for construction," and that AMASE's subsequent changes to the A-frame pin

connections were not transmitted to DDE. The continued pin analysis and the design changes, with

no communication of those changes to the fabricator, supports an inference of breach of contract.

The evidence that the failure would have occurred had the mast been built without DDE's changes

to the "issued for construction" design drawings supports an inference of a causal connection between the breach of contract and the mast failure.

AMASE's motion for summary judgment dismissing the breach of contract claim is denied.

## IV.    Conclusion

This court:

- denies summary judgment as to the negligence claims against both defendants;

- grants summary judgment as to the breach of express warranty claims against both defendants;

- grants summary judgment as to the breach of implied warranty claims against both defendants;

- grants summary judgment as to the breach of contract claim against Turner; and

- denies summary judgment as to the breach of contract claim against AMASE.

A status and scheduling conference is set for **August 5, 2014**, **at 2:00 p.m. in Courtroom 11-B.**

SIGNED on July 29, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge